UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | |
| v. | | CASE NO. 1:25-CR-5-HAB-ALT |
| JAMON P. WILLIAMS, | | |
| Defendant. | | |

**OPINION AND ORDER**

The Government charged Defendant, Jamon Williams ("Williams"), in a single count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1). This matter is before the Court on the Defendant's Motion to Suppress (ECF No. 20), filed on March 3, 2025. The Defendant requests that the Court suppress a handgun he was openly carrying—as well as another handgun discovered during a frisk—when police officers stopped him in response to an anonymous 911 call reporting a black male making threats while waving around a gun on December 20, 2024.

On April 25, 2025, the Court held an evidentiary hearing on the motion. After the filing of the transcript from that hearing, the Government filed an opening brief (EFC No. 29) to which the Defendant responded on August 13, 2025 (ECF No. 32) and the Government replied on September 4, 2025 (ECF No. 35). For the following reasons, the Court will DENY the Defendant's Motion to Suppress.

**FACTUAL BACKGROUND**

At approximately 10:05 PM on December 20, 2024, a 911 caller reported that a black male in his thirties at Alberto's—a local Mexican restaurant—was "acting crazy," making threats, and pulling out a handgun to point at people. (Evid. Hr'g Tr. at 10, ECF No. 25, at 8).[1] The caller also mentioned the suspect was associated with a dark-colored Chevy Impala.

Given the potential severity of the situation, multiple Fort Wayne Police Department ("FWPD") units were dispatched to the scene, with the first patrol unit arriving at 10:08 PM, minutes after the 911 call. (Tr. at 9 (noting call was given highest priority which can be "based on the severity of what the caller is insinuating is going on, the severity of the possible crime that's being committed, as well as the time lapse of the incident, whether it's immediate or it happened a couple of hours ago")). Responding officers were met with a relatively quiet scene and a nearly empty parking lot. Among those first at the scene was FWPD Officer Ryan Matteson, who quickly radioed to other units that there was an empty black Impala in the parking lot of the restaurant. (Gov't Ex. 1c, at 2:28). The officers then split up to investigate, with some staying in the parking lot to speak with a teenager in a white car next to the empty Impala and others checking inside the restaurant. (*Id.*; *see also* Gov't Ex. 1b, at 3:00–6:10).

Inside, Officers Matteson, Branden Campo, and Detective Ross McGillivray came across multiple black males including Jamon Williams, who was attempting to leave the restaurant with a bag of food as officers walked in. (*Id.* at 3:30–35). Williams was openly carrying a firearm tucked into his front right waistband, (Gov't Ex. 6), and Detective McGillivray reached out to flip open

---

[1] Although the 911 call was not submitted as evidence, the Government did introduce the Call Detail Report ("CAD"), which shows the notes the 911 dispatcher relayed to the police officers: "mb 30's 'talking crazy' and making 102's to people, pulling a handgun out and pointing it at people. Drk impala." (Gov't Ex. 2a, at 2). Officer Sage Knopp testified at the hearing that the coded language translated to a male black in his thirties making threats (102s), pulling a handgun out and pointing it at people. (Tr. at 10–11). The coded language is what officers relied on when responding to the call, as they did not hear or have access to the 911 call itself.

the right side of Williams's jacket—which was partially concealing the weapon—as they crossed paths (Gov't Ex. 1c, at 3:34). When Williams asked why the officer had grabbed him, Detective McGillivray responded that they had reports of someone waving a gun at people and further pointed out that Williams was the only one with a gun in plain view. (*Id.* at 3:47). Williams denied he'd been waving his gun and initially refused to answer the officers' questions about his name or what car he drove but ultimately confirmed that he drove a black Impala. (*Id.* at 4:14). Denying any wrongdoing, Williams told officers that he would leave, to which one of the officers responded, "No, you're sitting tight." (*Id.* at 4:31). Officer Matteson radioed in to ask whether the 911 caller was still on the line and proceeded to place Williams in handcuffs. (*Id.* at 4:33–5:05; Tr. at 92). At the same time, Officer Mason Wills removed the firearm, a Taurus Model 44 revolver, from Williams's waistband. (Tr. at 92; Gov't Ex. 4). Detective McGillivray also verbally noted that Williams appeared to be drunk and that he smelled of alcohol. (Gov't Ex. 1c, at 5:07–11).

Officers put Williams in the back of a police vehicle as they conducted further investigation. (*Id.* at 7:20–8:20; *see also* Tr. at 25 (officer testifying that Williams was placed in the car "[j]ust until we could run the information that we needed, i.e., his name, make sure no warrants or anything like that and then check his firearm status")). Officer Sage Knopp testified at the evidentiary hearing that during this time the officers were trying to locate any witnesses on the scene as well as get back in contact with the 911 caller, who had left the scene after the call. (Tr. at 26).[2] Officer Knopp also spoke with another black male inside the restaurant, who denied having seen Williams doing anything illicit. (Gov't Ex. 1a, at 5:40–6:00). She further testified that she

---

[2] The CAD shows the 911 caller eventually called the dispatcher back to provide more information, which the dispatcher noted as: "mb 30's skinny, no clothing s83, cp just keeps saying impala. hes in an impala. cp not sure who all he pointed it at she saw it and took off." (Gov't Ex. 2a, at 2). Officer Knopp explained that "s83" meant there was no clothing information, and that "cp" referred to the complainant (the 911 caller).

3

conducted a more comprehensive search of Williams after he'd been placed in the patrol car, during which he admitted to having another firearm on his person. (Tr. at 27; Gov't Ex. 1a, at 12:12–13:00). Officer Knopp removed a Springfield XD9 pistol from a shoulder holster under Williams's left arm. (Gov't Ex. 5). Shortly after, Officer Wills—who had been conducting a records check in a separate police vehicle—confirmed that Williams was a felon. (Gov't Ex. 1a, at 14:21). According to the CAD, about seventeen minutes had elapsed between the anonymous 911 call and officers discovering Williams was a prohibited person. (Gov't Ex. 2a, at 2).

Based on these facts, the Defendant asserts that he was detained from the moment Detective McGillivray first touched him, before he had confirmed he drove the Impala, and that, based on the information available at the time, the officers did not have a reasonable suspicion to stop and detain him, meaning his detention "exceeded the bounds of a lawful *Terry* stop and amounted to an unlawful arrest." (ECF No. 32 at 1). For these reasons, Defendant seeks to suppress the firearms seized that night.

## **DISCUSSION**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const.. amend. IV. "Stopping someone is generally considered a seizure and ordinarily requires probable cause to be reasonable." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). That said, the Supreme Court recognized an exception to this general principle in *Terry v. Ohio*; thus, under *Terry*, a police officer can stop and briefly detain a person for investigative purposes without violating the Fourth Amendment if the officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *see also United States v. Rodriguez-Escalera*, 884 F.3d 661, 68 (7th Cir. 2018) ("To meet the reasonable-suspicion

4

requirement, an officer must have 'a particularized and objective basis' for suspecting the persons detained of breaking the law.") (quoting *Heien v. N. Carolina*, 574 U.S. 54, 60 (2014)).

Reasonable suspicion is an objective standard in which the court considers the totality of the circumstances. *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019). The reasonable suspicion standard is "less than probable cause"—necessary for an arrest—and "considerably less than preponderance of the evidence." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (quotations omitted). That said, reasonable suspicion "requires more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). And when a defendant challenges the validity of a *Terry* stop, the Government bears the burden of showing that the officers had reasonable suspicion. *See United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

Although Defendant puts forward multiple arguments for why the stop was unlawful, those arguments all trace back to Defendant questioning the reliability of the anonymous 911 call and whether the call, combined with the officers' observations upon arriving on the scene, supported a *Terry* stop of Williams. "Because anonymous tips relayed to a police officer 'seldom demonstrate[ ] the informant's basis of knowledge or veracity,' they alone usually are not reliable enough to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). But the Supreme Court has identified "three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *Id.* (citing *Prado Navarette v. California*, 572 U.S. 393, 399–401 (2014)).

All three factors are present here. The anonymous 911 caller reported witnessing a male black in his thirties, somehow associated with a black Impala, waving around a gun and threatening people at this specific location. Though the 911 recording was not admitted, the CAD report suggested that the conduct was ongoing by using active language to describe the scene: talking crazy, making threats, pulling, pointing. (Gov't Ex. 2a, at 2). And though the caller left the scene and indicated that she wished to remain anonymous, the dispatcher was nevertheless able to get the caller back on the phone to provide more information, rendering it less likely that she was making a false report. *See Prado Navarette*, 572 U.S. at 400 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."); *cf. Watson* (distinguishing *Prado Navarette* because the caller "borrowed a stranger's phone, limiting the usefulness of the system's tracing ability and making it "not obvious that the young caller would be worried about getting caught providing false information and therefore 'think twice' before doing it"). Under this circuit's precedent, those circumstances are enough to give officers reasonable suspicion to conduct an investigatory stop. *See United States v. Williams*, 731 F.3d 678, 684–85 (7th Cir. 2013) (affirming reasonable suspicion was supported by a 911 call reporting "that there was a large group of people being loud and waving guns . . . in a location at which violent crime and drug activity is regularly reported").

The Defendant relies heavily on *United State v. Lopez*, 907 F.3d 472 (7th Cir. 2018), for his assertion that the 911 call here should not be enough to support reasonable suspicion because the caller wanted to remain anonymous and not work with responding officers, meaning officers had to "verify at least some facts supporting the informant's allegation of criminal activity before seizing the subject of the tip." (ECF No. 32 at 6 (quoting *Lopez*, 907 F.3d at 482)). But the facts and the law in *Lopez* are readily distinguishable. There, the anonymous tip was given in person by

6

an informant who gave officers information about a longstanding drug operation he was involved in—including offering the mechanics of a typical transaction—before the informant stopped cooperating with the police and eventually disappeared. *Lopez*, 907 F.3d at 476. In *Lopez*, there was no ongoing emergency and the seizure was deemed unlawful in part because the officers conducted no investigation to corroborate anything the informant had alleged before detaining Lopez. *Id.* at 482.

Beyond that the standard for reasonable suspicion based on a 911 call is different than that from a non-911 unverified anonymous tip, what sets the case here apart is the ongoing emergency in a potentially dangerous person threatening others with a gun. "Reports of emergencies have a 'special reliability,' requiring 'a lower level of corroboration.'" *Watson*, 900 F.3d at 896 (quoting *United States v. Hicks*, 531 F.3d 555, 559–61 (7th Cir. 2008)). That "special reliability" may be found where callers report tense situations, "like a verbal argument or physical confrontation, that suggest[s] violence would erupt." *Id.*; *see also Hicks*, 531 F.3d at 460 (determining a tip was sufficiently reliable where caller reported "armed black-clothed black man was involved in an ongoing domestic disturbance"); *Williams*, 731 F.3d at 684 (concluding a 911-reported emergency justified stop where "large group of people [were] being loud and waving guns" in a known violent-crime area). Just such an emergency existed here, as shown by a multitude of officers responding and arriving at the scene within minutes of the call. As officers testified at the evidentiary hearing, there were multiple potential crimes they could have encountered based on those facts—misdemeanor or felony pointing a firearm at another person, I.C. § 35-47-4-3; intimidation with a deadly weapon, I.C. § 35-45-2-1—and the call was given the highest priority based on the potential seriousness of the situation. *See* Tr. at 8–9, 88. The additional factor that the 911 caller noted the suspect's instability—that he was "talking crazy" and making threats—only

increases the potential threat of the situation. Given these circumstances, the Court finds that "special reliability" existed here which required a lower level of corroboration before the officers could conduct a *Terry* stop. *See Williams*, 731 F.3d at 685 ("Thus, here, where the caller remained anonymous, but provided very specific details about the location and activities of a group of men, I believe that low level of corroboration is satisfied.").

Additionally, though the situation had changed in the few minutes between the 911 call and the officers' arrival, the presence of the black Impala at the specific location provided enough corroboration to rely on the emergency call. Although officers found a quieter scene than what the caller had reported, the close temporal proximity and the presence of the Impala mean the report was not stripped of its emergency nature. *See United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008) (upholding stop of an armed person where 911 caller described an armed black male who pulled out his gun while arguing with his girlfriend, but couple was no longer arguing when police responded); *Williams*, 731 F.3d at 686 (noting the changed circumstances—fewer people in the group, no brandished weapons—did not negate reasonable suspicion because "in a previously-volatile situation in which guns have recently been reported, officers can (and likely should) proceed with a reasonable suspicion that violence may break out again in a short time").

Finally, Defendant maintains that he was not free to leave as soon as Detective McGillivray touched him, nearly a minute before Defendant confirmed his connection with the black Impala, meaning he was stopped *only* because he had a firearm. First, the Court has reviewed the body-camera footage admitted into evidence, and it finds no reason to believe that the detention started when Detective McGillivray flipped open Defendant's jacket to confirm he was openly carrying a firearm in his waistband. (*See* Gov't Ex. 1c, at 3:34). Indeed, Defendant cannot reasonably assert he felt he was not free to leave at that time given that he explained multiple times that he was going

to leave before an officer told him "No, you're sitting tight"—*after* Defendant had already confirmed he drove the black Impala. (*Id.* at 3:55–4:31). So even though Williams may have been stopped by officers as he was attempting to leave the restaurant, and even though one of those officers briefly touched him, the Court finds the officers' actions were well within the confines of a lawful investigative stop. *See United States v. Eymann*, 962 F.3d 273, 295 (7th Cir. 2020) (finding defendants were not "under arrest" despite being stopped by "quite a few uniformed officers and police cars" because defendants were questioned immediately, calmly, and without drawn weapons or raised voices, meaning the show of force was "minimal"); *United States v. Askew*, 403 F.3d 496, 508–09 (7th Cir. 2005) (holding officers surrounding a suspect's car to prevent him from leaving did not convert stop into arrest).

An investigative stop under *Terry* can involve two stages: (1) the stop and (2) a protective pat-down search. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). The first stage is the actual stop itself, where an individual is briefly detained by an officer and asked questions for investigative purposes—and that detention is justified so long as the officer has reasonable suspicion. *Id.* As already detailed above, the 911 call provided reasonable suspicion for an investigative stop. And while Defendant is correct that officers cannot lawfully stop someone just because they have a gun, that is simply not what happened here; officers received a report of a 911 call with enough information to identify Defendant as a suspect for criminal activity because he matched the description of the suspect: an armed male black in his thirties associated with a dark Impala.

Defendant was then handcuffed and placed in the back of a patrol car while officers conducted further investigation—namely speaking to other potential witnesses and researching whether Defendant could lawfully carry a firearm—and a mere seventeen minutes passed between

9

the 911 call and officers discovering Defendant was a prohibited person. Notably, neither being handcuffed nor placed in the back of a patrol car automatically convert a lawful *Terry* stop into a full custodial arrest. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("We have previously found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force were traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances."); *see also United States v. Tilmon*, 19 F.3d 1221, 1226 (7th Cir. 1994) ("The mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety."). Given that officers were dispatched in response to a report of a man threatening others and waving a gun around, combined with the fact that officers discovered not one, but two firearms on Defendant's person, the use of handcuffs and placement of Defendant in the patrol vehicle while the officers conducted further investigation was a reasonable precaution and did not convert the stop into a full custodial arrest. And the seventeen minutes it took to arrive and investigate the scene before officers discovered Defendant's prohibited status—and thus gained probable cause to arrest—is well within the bounds of reasonable detention time. *See Bullock*, 632 F.3d at 1015 (holding detention of suspect for 30–40 minutes was reasonable investigatory detention); *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (determining one-hour detention in squad car did not transform *Terry* stop into arrest).

      Accordingly, the Court finds that no Fourth Amendment violation occurred.

## **CONCLUSION**

Based on the foregoing, the Defendant's Motion to Suppress (ECF No. 20) is DENIED.

A scheduling order will be issued by separate entry.

SO ORDERED on September 16, 2025.

_s/Holly A. Brady_
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
